ROBERT F. HEDRICK, Esq.  (HSBA # 010479)
AVIATION LAW GROUP PS
3431 E. Superior St.
Seattle, WA 98122
E-mail: hedrick@aviationlawgroup.com
(206) 464-1166
Attorneys for Plaintiff NAOMI K. TEVES-VALDEZ

JOHN T. O'CONNELL, Esq. (HSBA # 010715)
O'CONNELL & ASSOCIATES
162 Hatherly Road
Scituate, MA   02066
E-mail: oconnell@jtclaw.com
(617) 996-2500
Attorneys for Plaintiff MELE HESIA

ROBERT MIYASHITA (HSBA # 9509)
JEREMY K. O'STEEN (HSBA # 10682)
MIYASHITA & OSTEEN, LLLC
735 Bishop Street, Suite 421
Honolulu, Hawaiʻi  96813
E-mail: miyashita@molawhawaii.com
(808) 909-8770
Attorneys for Plaintiff TRACY RADER

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAIʻI

| | |
|---|---|
| NAOMI K. TEVES-VALDEZ, Individually and as Personal Representative of the Estate of ERIKA J. TEVES-VALDEZ, Deceased; MELE HESIA, as Personal Representative of the Estate of MATTHEW CHRISTOPHER HAIDER; TRACY RADER, Individually and as Personal Representative of the Estate of PATRICK JAMES RADER, <br><br>              Plaintiffs, <br><br>        vs. <br><br> CROMAN CORPORATION (CROMAN CORP.), a Foreign Corporation; and UNITED STATES OF AMERICA, <br><br>              Defendants. | CV _____ <br><br> **COMPLAINT FOR WRONGFUL-DEATH, SURVIVAL, PERSONAL-INJURY, AND PUNITIVE DAMAGES** |

COME NOW Plaintiffs NAOMI K. TEVES-VALDEZ, Individually and as Personal Representative of the Estate of ERIKA J. TEVES-VALDEZ, Deceased, MELE HESIA, as Personal Representative of the Estate of MATTHEW CHRISTOPHER HAIDER, TRACY RADER, Individually and as Personal Representative of the Estate of PATRICK JAMES RADER, who complain against Defendants, and each of them, and for Causes of Action allege as follows:

## <u>JURISDICTION AND VENUE</u>

1.     As is hereinafter more fully set forth, the helicopter accident which gave rise to this lawsuit ("the subject accident") satisfies the requirements for admiralty tort jurisdiction set forth in *Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995) in that:

a.     The torts that caused the subject accident occurred and accrued upon and above the navigable waters of the Pacific Ocean within the territorial waters of the State of Hawai'i less than one marine league from the shores of the Island of Kauai, even though they may have been "consummated on land" as that phrase is used in the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 30101(a);

b.     The subject accident had a potentially and indeed an actually disruptive impact on maritime commerce;

c.      At least one of the Defendants was engaged in activity substantially related to traditional maritime commerce activity; and

d.      The operation, mission, and activity of the helicopter involved in the subject accident comprised traditional maritime activity.

2.      This Court has subject matter jurisdiction, in admiralty, pursuant to 28 U.S.C. § 1333, 46 U.S.C. §30903 (commonly known as the "Suits in Admiralty Act"), and Fed.R.Civ.P. 9(h).

3.      Venue is proper in this Court pursuant to 46 U.S.C. §30906(a) because Plaintiffs reside in Hawai'i. Venue is also proper under 28 U.S.C. § 1391(b)(2) in that the acts and omissions complained of herein occurred within the Federal Judicial District of Hawai'i, including the subject helicopter accident and related damages.

## PARTIES

4.      Plaintiff NAOMI K. TEVES-VALDEZ is, and at all relevant times herein was, a citizen and resident of the State of Hawai'i. Plaintiff is also the spouse of ERIKA J. TEVES-VALDEZ, Deceased ("Decedent TEVES-VALDEZ") as that term is used in 46 U.S.C. §30302 and incorporated into general maritime law. Plaintiff TEVES-VALDEZ is the mother of Decedent TEVEZ-VALDEZ's two minor children, as that term is used in 46 U.S.C. §30302 and incorporated into general maritime law. Plaintiff TEVES-VALDEZ is the Executor and duly designated "personal representative" of Decedent TEVES-VALDEZ's Estate, as

that phrase is used in 46 U.S.C. § 30302 and incorporated into general maritime law. Plaintiff TEVES-VALDEZ was also near the location of the subject helicopter accident when it occurred. She brings this action individually, on her own behalf, and in her capacity as Decedent TEVES-VALDEZ's personal representative, for the benefit of all wrongful death and survivor action beneficiaries, including herself.

5.    Decedent TEVES-VALDEZ, was born in March 1979.  At all times material hereto, she was a citizen and resident of the State of Hawai'i and a "non-seafarer" as that term is used in *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 205 n. 2 (1996).

6.  Decedent's TELVES-VALDEZ's beneficiaries include the following:

    A. **Spouse**:  Plaintiff TEVES-VALDEZ – Ms. TEVES-VALDEZ is a "Spouse" beneficiary as that term is used in 46 U.S.C. § 30302 as incorporated into general maritime law. She is also bringing this action individually, and as Personal Representative of the Estate of Erika J. Teves-Valdez, for the estate and on behalf of all beneficiaries.

    B. **Son**: CTV was born in 2015, is the minor son of Decedent TEVES-VALDEZ, and is a "Child" beneficiary as that term is used in 46 U.S.C. § 30302 and incorporated into general maritime law.

C. **Daughter**: ATV was born 2017, is the minor daughter of Decedent TEVES-VALDEZ and is a "Child" beneficiary as that term is used in 46 U.S.C. §30302 and incorporated into general maritime law.

D. **Father**: Stanford John Valdez is the father Decedent TEVES-VALDEZ and a "Parent" beneficiary as that term is used in 46 U.S.C. § 30302 and incorporated into general maritime law.

E. **Mother**: Yvonne Saballa is the mother of Decedent TEVES-VALDEZ and a "Parent" beneficiary as that term is used in 46 U.S.C. § 30302 and incorporated into general maritime law.

7.      Plaintiff MELISSA HESIA is, and at all relevant times herein was, a citizen and resident of the State of Hawai'i.  Plaintiff HESIA is the mother of Decedent MATTHEW CHRISTOPHER HAIDER's ("Decedent HAIDER") two minor children, KMH and DHM, and the Executor and duly designated "personal representative" of his Estate as that phrase is used in 46 U.S.C. § 30302 and incorporated into general maritime law.

8.      Decedent HAIDER was born in May of 1978.  At all times relevant hereto, he was a citizen and resident of the State of Hawai'i and a "non-seafarer" as that term is used in *Yamaha Motor Corp. v. Calhoun, supra.*

9.  Decedent HAIDER's beneficiaries include the following:

A. **Spouse**:  Rosanne Colleen Fox is Decedent HAIDER's widow and a "Spouse" beneficiary as that term is used in 46 U.S.C. § 30302 and incorporated into general maritime law.

B. **Son**: KMH was born in 2006, is Decedent HAIDER's and Plaintiff HESIA's minor son, and is a "Child" beneficiary as that term is used in 46 U.S.C. § 30302 as incorporated into general maritime law.

C. **Son**: DMH was born in 2008, is Decedent HAIDER's and Plaintiff HESIA's minor son, and is a "Child" beneficiary as that term is used in 46 U.S.C. § 30302 as incorporated into general maritime law.

D. **Mother**: Penny L. Haider is Decedent HAIDER's mother and a "Parent" beneficiary as that term is used in 46 U.S.C. § 30302 as incorporated into general maritime law.

10.    Plaintiff TRACY RADER ("Plaintiff RADER") is, and at all relevant times herein was, a citizen and resident of the State of Hawai'i. Plaintiff is the surviving spouse of PATRICK JAMES RADER, Deceased ("Decedent RADER") as that term is used in 46 U.S.C. §30302 and incorporated into general maritime law. Plaintiff RADER is also the Executor and duly designated "personal representative" of Decedent RADER's Estate, as that phrase is used in 46 U.S.C. § 30302 and incorporated into general maritime law. She brings this action individually, on her

own behalf, and in her capacity as Decedent RADER's personal representative, for the benefit of all wrongful death and survival action beneficiaries, including herself.

11.    Decedent RADER, was born July 29, 1966.  At all times material hereto, he was a citizen and resident of the State of Hawai'i and a "non-seafarer" as that term is used in *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 205 n. 2 (1996).

12.    Decedent's RADER's beneficiary is Plaintiff RADER. Ms. RADER is a "Spouse" beneficiary as that term is used in 46 U.S.C. § 30302 as incorporated into general maritime law. She is also bringing this action individually, for the Estate of PATRICK JAMES RADER, and on behalf of all beneficiaries.

13.    The UNITED STATES Navy (hereinafter "Navy") is an Armed Force of the UNITED STATES and is part of the UNITED STATES Department of Defense, which is an entity/instrumentality and/or agency (agent) of Defendant UNITED STATES of America (hereinafter "UNITED STATES") within the meaning of 46 U.S.C. §30904. At all times material hereto, Defendant UNITED STATES, which exists under and by virtue of its own laws, has waived sovereign immunity for civil actions in admiralty pursuant to 46 U.S.C. §30903(a), and is subject to liability for the torts alleged herein. The UNITED STATES is the proper party defendant for Plaintiffs claims herein against the UNITED STATES Department of Defense, Navy, and against Navy contractor and agent Defendant CROMAN. As discussed below, the contract and operational facts establish a

relationship of principal (UNITED STATES) and agent (CROMAN). As such, the UNITED STATES is a proper party under the Suits in Admiralty Act, 46 U.S.C. §30904, and is liable for the acts and omissions of its agent CROMAN, as alleged herein.

14.    At all times material hereto, Defendant CROMAN Corporation or CROMAN Corp. (hereinafter "CROMAN") was, and still is, a business corporation organized and existing under the laws of the State of Oregon, doing business in the State of Hawai'i, among numerous others, as a commercial helicopter operator and maintainer, and having its principal place of business in White City, Oregon. At all times relevant hereto, Defendant CROMAN was under contract with the U.S. Navy, Department of Defense, and was an agent of Defendant UNITED STATES within the meaning of the Suits in Admiralty Act 46 U.S.C. Ch. 309. Alternatively, if CROMAN was not such an agent, CROMAN is a proper party defendant for Plaintiffs' claims as alleged herein.

## GENERAL ALLEGATIONS

15.    Since before World War II, the Navy has been employing ocean-going vessels at the traditionally maritime task of locating, recovering, transporting, and returning training and test torpedoes from and across navigable waters to Navy bases on shore. While the recovery and transportation of such torpedoes by ocean-going vessels continues to this day, during the years since World War II, the Navy has also

---

employed amphibious helicopters (capable of flying over, landing upon and taking off from navigable water) to perform that traditionally maritime task.

16.    Since at least 2009, the UNITED STATES has contracted CROMAN to provide the Navy with helicopters and a broad range of helicopter services in connection with the missions and operations the Navy performs at the Pacific Missile Range Facility ("PMRF") on the Hawaiian Island of Kauai.  PMRF is located on the Barking Sands Beach on the western shore of Kauai.  The helicopters and helicopter services CROMAN provided to the Navy under that contract ("the subject contract") were based at PMRF's Barking Sands Airport. That airport's runways are located just inshore from, and parallel to, Barking Sands Beach.  At some points, those runways lie no more than 50- to 100-feet from the Pacific Ocean. The services CROMAN preforms under that subject contract include, but are not limited to:

a.    Recovering submarine targets;

b.    Clearing vessels and sea life from offshore test zones before mine drops and weapons practice;

c.    Transporting military personnel to and from naval vessels;  and

d.    Locating and retrieving mobile targets towed by MK 46 and MK 50 torpedoes.



*A CROMAN S-61N Helicopter with a Torpedo in Its Recovery Basket.*

17.    The MK 46 and MK 50 torpedoes described in Paragraph 16 hereinabove are typically launched into the Pacific Ocean, whence they tow mobile targets that are used for weapons' practice by maritime defense systems located in all environmental spheres, including underwater, on the surface, in the air, and in orbit. The helicopters CROMAN supplies to the Navy under the subject contract perform missions that have been traditionally entrusted to "vessels," as that term is defined in 1 U.S.C. § 3, and are thus regularly required to travel to recovery points up to 100 nautical miles offshore, remain on station (maneuvering out of ground effect) for an hour or more, grapple and retrieve spent torpedoes, and then return those torpedoes to shore.  After locating the torpedoes, CROMAN's helicopters typically grapple and retrieve them from the water with a cone-shaped recovery basket that is suspended from the belly of the helicopter by long cables (see photo

above). The helicopter then returns to base with the torpedo hanging below it, as depicted in the image on page 10 *supra*.

18.    The typical external-sling load for the torpedo-recovery missions described in Paragraph 16 hereinabove, including the one that was being conducted at the time of the subject accident ("the accident mission"), was approximately 3,250 pounds and was composed of a long buoyant line, a cone-shaped recovery basket, and a recovered torpedo.

19.    The subject contract not only specified operational requirements and minimum-load capacities for the helicopters CROMAN flew out of PMRF – including the capacity to recover and transport MK 30, MK 46, and MK 50 torpedoes from, upon, and over navigable waters -- it also incorporated hundreds of mandatory government, military, regulatory, and other standards, practices, and procedures by reference. Among other things, those incorporated standards, practices, and procedures obligated the Navy to undertake regular audits of CROMAN's aircraft operations, including its aircraft-maintenance procedures, pursuant to Defense Contract Management Agency Tri-Services Instruction No. 8210.

20.    Under the terms of the subject contract, the Navy consented to let CROMAN act on its behalf and subject to its direction and control, and CROMAN consented so to act.  Throughout the subject contract, and during the accident mission, the Navy exercised significant control, oversight, direction, and supervision

over CROMAN operations. Among other things, the Navy mandated that all the helicopters and personnel CROMAN supplied under the subject contract were to be used solely for Navy purposes and missions, that those helicopters were to be kept and maintained solely at Navy facilities, and that all their missions were to be planned and conducted under the direction and control of the Navy, during times and at locations mandated by the Navy.

21.    In light of the extensive, offshore flight operations called for by the subject contract, the Navy required CROMAN to equip each of its helicopters with Coast Guard approved life preservers or personal flotation devices for all occupants on all flights over the water, life rafts equipped with signal and navigation lights, a pyrotechnic signaling device, an emergency locator beacon, and many other high-seas, survival-related items.   The subject contract also required CROMAN's helicopters to be equipped either with emergency aircraft flotation gear (commonly called pop-out floats) or standard flotation gear (fixed floats).

22.    The Sikorsky S-61N helicopters that CROMAN designated for use under the subject contract were amphibious and capable of landing on, floating upon, and taking off from navigable water. The helicopter CROMAN deployed on the accident mission ("the accident helicopter"), N615CK, was a Sikorsky S-61N. The FAA-issued Type Certificate for the S-61N states that this model is an "Amphibious Transport Helicopter." In order to land upon and takeoff from the water, the S-61N

---

is specially equipped with vessel-like design features including a seaworthy underbody or "hull," floats or "sponsons" extending out from that hull to provide additional floatation and stability in the water, and a modified tail or after pylon designed to increase tail-rotor clearance above the water. In addition to the minimum crew of two pilots, the S-61N FAA-approved Type Certificate specifies a maximum passenger capacity of 39.

23.   On February 22, 2022, the day of the accident, the Navy directed CROMAN to dispatch one of the S-61 N helicopters based at PMRF on a training mission to locate, grapple, and recover a torpedo out on the Pacific Ocean in the manner described in Paragraph 17 hereinabove, and then transport that torpedo back to base. CROMAN assigned N615CK, the accident helicopter, to that mission.



*The accident helicopter N615CK.*

24.   The crew of the accident helicopter on February 22, 2022, was pilot Daniel Maurice, co-pilot Patrick Rader, and operation specialists Erika J. Teves-

Valdez and Mathew Haider. All four were aboard at the time of the subject accident.

25.    According to ADS-B tracking data, the accident helicopter took off from PMRF shortly after 9:00 a.m. and flew to a site in the Pacific Ocean, 44 miles north/northwest of Kauai, to locate, grapple, and retrieve a target torpedo. ADS-B recorded the track of the flight path, including outbound and inbound legs. ADS-B data reveals that over 99% of this flight was over the Pacific Ocean.



*ADS-B track data for N615CK, reflecting outbound, and inbound tracks.*

26.    At approximately 10:20 a.m., as the helicopter approached shore very close to the drop-off location, it was flying about 280 feet above the water. It then began a shallow left turn to maneuver north into the prevailing wind. That turn stopped as the helicopter reached a northeasterly direction. At that time, as reported

by multiple witnesses who were located near the accident site, the helicopter pitched nose first nearly straight down and crashed into the ground in a near-vertical attitude. The helicopter exploded on impact and burst into flames. All four persons on-board tragically died. As discussed below, the accident became inevitable while the helicopter was flying over the Pacific Ocean, above the territorial waters of the State of Hawai'i.

27.    Post-accident investigation discovered that the rod end of the fore/aft servo input link had become partially disconnected from the clevises due to a backing out of the attachment bolt. The bolt's nut and securing cotter pin were missing and were never located. Evidence indicated that the bolt did not exhibit any fractures or deformation, and its threads did not exhibit unusual wear or strip marks. The attaching hardware backed out of its normally installed position during the accident flight due to the absence of its nut and cotter pin. This most likely occurred gradually, while N615CK was flying over the Pacific Ocean, and the nut most likely fell off during the moments before the crash while the helicopter was over territorial waters within one marine league from shore. The result was that the helicopter lost all flight control seconds before falling nose first out of the sky. After the fore/aft servo input link became disconnected, there was nothing the pilots could do to avoid or prevent the accident. The pilots who were in radio contact with local air traffic control, did not report any issues before the accident.

_____



*N615CK Fore/Aft Primary Servo At Input Clevis Link, After The Accident.*

28. Further post-accident investigation determined that the last maintenance performed by CROMAN related to the fore/aft primary servo was on December 28, 2021, when the servo was re-installed. Since that time and up until the accident date, N615CK flew approximately 7.5 hours. The accident flight involved approximately 1.2 hours flight time until the accident. During this combined flight time more than 98% of the time N615CK flew over the Pacific Ocean, which is where the attaching hardware backed out of its normally installed position causing the accident. As hereinabove more fully appears, the helicopter was also over the Pacific Ocean, in the territorial waters of the State of Hawai'i, during the accident flight, when it became inevitable that the crash was going to occur. The

_____

below reflects ADS-B tracking of the previous N615CK flights that occurred after the last maintenance and before the accident:



29.    The maintenance task of re-installing the fore/aft primary servo in December 2021 was incorrectly performed such that it allowed the bolt to back out of its position in flight, which made the fore/aft flight control servo entirely ineffective, causing the accident. CROMAN's certified inspector and head of maintenance, who was responsible for quality control inspections and approval of all maintenance before return to service, failed to properly inspect the hardware attaching the fore/aft servo input link to the fore/aft primary servo or ensure that it was properly installed and safe for flight. Failure to have the fore/aft servo properly installed rendered the helicopter unairworthy and unsafe for flight. CROMAN's

inspector mechanic certified by maintenance log entries that N615CK was properly maintained and in an airworthy condition safe for flight after the subject maintenance in December 2021, when it was not.

30.    CROMAN's maintenance inspector and chief of maintenance specifically approved and signed off as complete and safe the installation of the Fore/Aft Servo on December 28, 2021. This was a false statement in that it represented that the helicopter's fore/aft Servo installation was airworthy and safe for flight when it was not.

31.    All of CROMAN's maintenance personnel, inspectors, and quality control persons were working in the scope of their employment during all relevant times herein, including during all maintenance work performed on N615CK in December 2021 and during the re-install, inspection, approval, and certification of the maintenance related to fore/aft servo re-installation. CROMAN's maintenance personnel were undermanned and overworked during the relevant time periods herein.

32.    Within days after February 22, 2022, the Defendants knowingly and willfully discarded and destroyed over 90% of the helicopter wreckage. The few remaining parts that were not destroyed include the engine, transmission, parts of the servo actuators, and a few other components. The Defendants intentional disposal of most of the wreckage right after the accident denied Plaintiffs access to

important and potentially critical evidence.

33.    Defendants have been involved in claims and litigation arising in many prior accidents involving helicopters. Defendants are experienced and well-seasoned parties to litigation claims based upon helicopter failures where mechanical and product liability-related wreckage evidence is important and critical to determining accident causation and liability. As of February 22, 2022, Defendants knew and understood the importance of preserving all wreckage, including all parts, components, and pieces, and had a duty to preserve all such wreckage. Defendants had a known duty to preserve 100% of the wreckage, which duty Defendants breached. Defendants' failure to protect and preserve the helicopter wreckage, causing spoliation of evidence, entitles Plaintiffs to relief and remedies that must be just and fair.

34.    Plaintiff NAOMI K. TEVES-VALDEZ timely and properly submitted her Administrative Claim Notification by presenting to the Navy a completed Form 95 with attached exhibits on April 17, 2023. On April 18, 2023, the Navy received the submission which was confirmed in an email to counsel on April 19, 2023. In a letter dated October 20, 2023, which was received by Plaintiff NAOMI K. TEVES-VALDEZ's counsel on November 2, 2023, the Navy rejected her claims. At no time did the Navy raise any procedural concerns or issues regarding Plaintiff NAOMI K. TEVES-VALDEZ Form 95 and attachments, nor with regard to presentation of the

---

claim. More than 6 months have passed since this claim was presented in writing to the Navy. Plaintiff NAOMI K. TEVES-VALDEZ fully complied with any and all claim notification requirements for her claims against defendant UNITED STATES as alleged herein.

35.    Plaintiff MELE HESIA timely and properly submitted her Administrative Claim Notification by presenting to the Navy a completed Form 95 with attached exhibits on April 17, 2023. On April 18, 2023, the Navy received the submission which was confirmed in an email to counsel on April 19, 2023. In a letter dated October 20, 2023, which was received by Plaintiff MELE HESIA's counsel on November 2, 2023, the Navy rejected her claims. At no time did the Navy raise any procedural concerns or issues regarding Plaintiff MELE HESIA's Form 95 and attachments, nor with regard to presentation of the claim. More than 6 months have passed since this claim was presented in writing to the Navy. Plaintiff MELE HESIA fully complied with any and all claim notification requirements for her claims against defendant UNITED STATES as alleged herein.

36.    Plaintiff RADER timely and properly submitted her Administrative Claim Notification by presenting to the Navy a completed Form 95 with attached exhibits on June 30, 2023. On July 10, 2023, the Navy received the submission which was confirmed in a letter to counsel on July 13, 2023. In a letter dated October 20, 2023, which was received by Plaintiff RADER's counsel on October 31, 2023,

---

the Navy rejected her claims. At no time did the Navy raise any procedural concerns or issues regarding Plaintiff RADER's Form 95 and attachments, nor with regard to presentation of the claim. More than 6 months have passed since this claim was presented in writing to the Navy. Plaintiff RADER fully complied with any and all claim notification requirements for her claims against defendant UNITED STATES as alleged herein.

## APPLICABLE LAW

37.    Plaintiffs herewith refer to, and by that reference incorporates as though fully set forth herein, each and every allegation set forth in paragraphs 1 through 36 hereinabove.

38.    This case arises under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, and the General Maritime Law of the UNITED STATES as handed down in *Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970), *Sea-Land Services v. Gaudet*, 414 U.S. 573 (1974), *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), and *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996),*inter alia*. Defendant UNITED STATES would, if a private person, be liable to the Plaintiffs and Decedents' heirs-at-law, in that the Navy and its agent Defendant CROMAN acted negligently and carelessly at all relevant times herein.

39.    In the alternative, if for some reason the Suits in Admiralty Act does not apply, and/or if it is determined that Defendant CROMAN was not an agent of

---

the UNITED STATES/Navy, General Maritime Law applies to Plaintiffs' claims herein against Defendant CROMAN.

## FIRST CAUSE OF ACTION

*(Wrongful Death on account of Negligence)*

40.    Plaintiffs herewith refer to, and by that reference incorporate as though fully set forth herein, each and every allegation set forth in all paragraphs above.

41.    As herein more fully appears, this Cause of Action arises under *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375 (1970), *Sea-Land Services v. Gaudet,* 414 U.S. 573 (1974), *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), and the General Maritime Law of the UNITED STATES, as supplemented by the Law of the State of Hawai'i under *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199 (1996).

42.    Defendants had an obligation and duty to properly inspect and maintain N615CK in an airworthy condition and safe for flight, in accordance with their contract and incorporations, including in accordance with the maintenance manual, checklists, and inspection checklist, and in full compliance with federal aviation regulations. This obligation and duty included proper installation and inspection of the fore/aft servo and its relevant connecting bolt, nut, and cotter pin.

43.    Defendants breached this duty by failing to properly install and inspect the fore/after servo and its relevant connecting bolt, nut, and cotter pin before

approving it for flight. Defendants also breached the duty by approving the helicopter as safe for flight when it was not.

44.    In light of the critical importance of the fore/aft servo, of which failure causes loss of control of the helicopter and most likely death if such failure occurs in flight, the installation maintenance required a knowledgeable supervisor to properly inspect and approve the proper, correct, and safe assembly of the relevant connecting bolt, nut, and cotter pin. The CROMAN Director of Maintenance signed off (in the N615CK Aircraft Maintenance Logbook Records) on performing this inspection of the relevant fore/aft servo, when in fact the inspection was not performed, or was performed in such a negligent and substandard manner, as to entirely miss the improper installation of the fore/aft servo. The inspector's approval caused the relevant fore/aft servo, and the entire helicopter N615CK, to be approved for return to service, and to appear airworthy and safe for flight on paper, when in fact it was not. The false entry approving improper and incomplete maintenance and certifying an inspection that likely did not occur, was a fraudulent maintenance entry of critical importance.

45.    On and before February 22, 2022, Defendants, acting by and through its personnel, acted carelessly and negligently, in that, among other things:

a.    They violated a manifest legal duty and failed to use reasonable care to properly maintain and inspect N615CK;

---

b.      They violated a manifest legal duty and failed to use reasonable care to comply with their contract obligations, including performing said maintenance and inspections in accordance with the maintenance manual, checklists, inspection checklist, and failed to comply with federal aviation regulations;

c.      They failed to use reasonable care to provide safe oversight, and to properly supervise and/or manage the maintenance and inspection of N615CK; and

d.      They provided an environment where maintenance personnel were undermanned and overworked.

46.     As a direct, proximate, and legal result of the hereinabove alleged delicts of Defendants, and each of them, N615CK was caused to tragically crash and burn, taking the life of Decedent and three others on board.

47.     ERIKA J. TEVES-VALDEZ was only 42 years old on the date of her death. Prior to her death, she was an adult person in good physical and mental health and condition and was a loving and supportive spouse, mother, and daughter. As a direct, proximate, and legal result of her death, her surviving spouse, Plaintiff NAOMI K. TEVES-VALDEZ, their minor children, and Decedent's parents , and each of them, have suffered and will continue to suffer the permanent loss of Decedent's care, comfort, services, guidance, advice, example, nurture, gifts,

support including financial support, household services, and inheritance all to their pecuniary damage in an amount to be determined at the time of trial.

48.    As a direct, proximate, and legal result of the death of Decedent ERIKA J. TEVES-VALDEZ, her surviving spouse Plaintiff NAOMI K. TEVES-VALDEZ, their minor children, and Decedent's parents, and each of them, have suffered and will continue to suffer the permanent loss of Decedent's love, affection, devotion, society, care, and consortium all to their non-pecuniary damage in an amount to be determined at the time of trial.

49.    As a further direct and proximate result of NAOMI K. TEVEZ-VALDEZ's death, her surviving spouse Plaintiff NAOMI K. TEVES-VALDEZ, their minor children, and Decedent's parents, and each of them, have suffered and will continue to suffer the grief and distress over Decedent's untimely death, for which they are entitled to compensation under Chapter 663, HRS, and other applicable law, in an amount to be determined at the time of trial.

50.    Plaintiff HESIA's Decedent, MATTHEW CHRISTOPHER HAIDER, was only 44 years old on the date of his death. Prior to his death, he was an adult person in good physical and mental health and condition and was a loving and supportive spouse, father, and son. As a direct, proximate, and legal result of his death, his surviving spouse, minor children, mother, and each of them, have suffered and will continue to suffer the permanent loss of his care, comfort, services,

guidance, advice, example, nurture, gifts, support including financial support, household services, and inheritance all to their pecuniary damage in an amount to be determined at the time of trial.

51.    As a further direct, proximate, and legal result of the death of MATTHEW CHRISTOPHER HAIDER, his surviving spouse, children, mother, and each of them, have suffered and will continue to suffer the permanent loss of his love, affection, devotion, society, care, and consortium all to their non-pecuniary damage in an amount to be determined at the time of trial.

52.    As a further direct and proximate result of MATTHEW CHRISTOPHER HAIDER's death, his surviving spouse, minor children, mother, and each of them, have suffered and will continue to suffer the grief and distress over his untimely death, for which they are entitled to compensation under Chapter 663, HRS, and other applicable law, in an amount to be determined at the time of trial.

53.    Plaintiff RADER's Decedent, PATRICK JAMES RADER, was only 55 years old on the date of his death. Prior to his death, he was an adult person in good physical and mental health and condition and was a loving and supportive spouse. As a direct, proximate, and legal result of his death, his surviving spouse has suffered and will continue to suffer the permanent loss of his care, comfort, services, guidance, advice, example, nurture, gifts, support including financial support,

household services, and inheritance all to her pecuniary damage in an amount to be determined at the time of trial.

54.     As a further direct, proximate, and legal result of the death of PATRICK JAMES RADER, his surviving spouse has suffered and will continue to suffer the permanent loss of his love, affection, devotion, society, care, and consortium all to their non-pecuniary damage in an amount to be determined at the time of trial.

55.     As a further direct and proximate result of PATRICK JAMES RADER's death, his surviving spouse has suffered and will continue to suffer the grief and distress over his untimely death, for which they are entitled to compensation under Chapter 663, HRS, and other applicable law, in an amount to be determined at the time of trial.

WHEREFORE, Plaintiffs pray judgement against Defendants, and each of them, for negligence as is herein more fully set forth.

## SECOND CAUSE OF ACTION

*(Survival Damages on account of Negligence)*

56.     Plaintiffs herewith refer to and by that reference incorporate, as though fully set forth herein, each and every allegation averred in their First Cause of Action.

_____

57.    As hereinabove and hereinafter more fully appears, this Cause of Action arises under *Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970), *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 211 (1996), *Davis v. Bender Shipbuilding and Repair Co.*, 27 F.3d 426, 430 (9th Cir. 1994), *Koirala v. Thai Airways International, Ltd*., 126 F.3d 1205, 1212 (9th Cir. 1997), and the General Maritime Law of the UNITED STATES, as supplemented by the Law of the State of Hawai'i under *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996).

58.    Just as the within cause of action arose in her favor, Decedent ERIKA J. TEVES-VALDEZ, who would have been a Plaintiff in this action had she lived, died as is hereinabove more fully alleged.

59.    As a direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, Decedent ERIKA J. TEVES-VALDEZwas placed in great fear for her life and physical well-being, and consciously suffered extreme, severe, and relentless mental anguish and physical pain, and continued to suffer such pain and anguish until she died.

60.    At the time of her death, Decedent ERIKA J. TEVES-VALDEZ, had a statistical life expectancy of more than 35 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, Decedent suffered a hedonic loss of her "enjoyment of life," as that phrase is used

in HRS § 663-8.5, all to her further general damage in an amount to be determined at the time of trial.

61.    Just as the within cause of action arose in his favor, Decedent MATTHEW CHRISTOPHER HAIDER, who would have been a Plaintiff in this action had he lived, died as is hereinabove more fully alleged.

62.    As a direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, MATTHEW CHRISTOPHER HAIDER was placed in great fear for his life and physical well-being, and consciously suffered extreme, severe, and relentless mental anguish and physical pain, and continued to suffer such pain and anguish until he died.

63.    At the time of his death, MATTHEW CHRISTOPHER HAIDER had a statistical life expectancy of more than 33 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, Decedent HAIDER suffered a hedonic loss of his "enjoyment of life," as that phrase is used in HRS § 663-8.5, all to his further general damage in an amount to be determined at the time of trial.

64.    Just as the within cause of action arose in his favor, Decedent PATRICK JAMES RADER, who would have been a Plaintiff in this action had he lived, died as is hereinabove more fully alleged.

_____

65.    As a direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, PATRICK JAMES RADER was placed in great fear for his life and physical well-being, and consciously suffered extreme, severe, and relentless mental anguish and physical pain, and continued to suffer such pain and anguish until he died.

66.    At the time of his death, PATRICK JAMES RADER had a statistical life expectancy of more than 22 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants, and each of them, Decedent RADER suffered a hedonic loss of his "enjoyment of life," as that phrase is used in HRS § 663-8.5, all to his further general damage in an amount to be determined at the time of trial.

WHEREFORE, Plaintiffs and each of them pray judgment against Defendants and each of them, for gross negligence or conduct even more deplorable as is hereinafter more fully set forth.

## <u>THIRD CAUSE OF ACTION</u>

(Plaintiff NAOMI K. TEVES-VALDEZ: *Negligent Infliction of Emotional Distress*)

67.    Plaintiffs herewith refer to and by that reference incorporates, as though fully set forth herein, each and every allegation hereinabove.

68.    As hereinabove and hereinafter more fully appears, this Cause of Action arises under *Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1009 (5th Cir. 1991); *Nelsen v. Research Corp. of the Univ. of Hawaii*, 805 F.Supp. 837, 849 (D.Haw. 1992); *Fawkner v. Atlantis Submarines, Ltd.*, 135 F.Supp.2d 1127 (D.Haw. 2001), and the General Maritime Law of the UNITED STATES, as supplemented by *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758 (1974), and otherwise by the Law of the State of Hawai'i, under *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996).

69.    At all times material hereto, Plaintiff NAOMI K. TEVES-VALDEZ was present at PMRF at the time of the accident, and in or near the zone of danger.

70.    As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendants, and each of them, Plaintiff NAOMI K. TEVES-VALDEZ was a horrified and shocked witness to the events that caused the death of her spouse, which events and injuries have naturally, foreseeably, demonstrably, and inevitably caused, and will continue to cause her serious and permanent, mental, emotional, and nervous pain, distress, and suffering, all to her general damage in an amount to be determined by the time of trial.

WHEREFORE, Plaintiff NAOMI K. TEVES-VALDEZ prays judgment against Defendants and each of them, for negligent infliction of emotional distress, and as is herein more fully set forth.

## <u>VICARIOUS LIABILITY</u>

71.    CROMAN is vicariously liable for the acts and omissions of its personnel, employees, and agents, as alleged herein for all causes of action under *respondeat superior* and agency law.

72.    The UNITED STATES is vicariously liable for the acts and omissions of its agents CROMAN and CROMAN's personnel and employees as alleged herein for all causes of action under agency law.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

A.    That judgment be entered in Plaintiffs' favor and against all the Defendants, and each of them, awarding:

1.    Pecuniary damages for the wrongful deaths of all Plaintiffs' Decedents;

2.    Non-pecuniary damages for the wrongful death of all Plaintiffs' Decedents;

3.    Survival damages for all Plaintiffs' Decedents conscious pre-death pain and suffering;

4.    Survival damages for all Plaintiffs' Decedent's hedonic loss of the enjoyment of life;

5.      General damages for all Plaintiffs and all beneficiaries physical, mental, emotional, and nervous, pain, suffering, and distress;

6.      Prejudgment and post-judgment interest, including pursuant to 46 U.S.C. §30911(a);

7.      Costs and expenses of suit;

8.      All emotional distress and related damages to Plaintiff NAOMI K. TEVES-VALDEZ arising from her being present at the location of the accident;

9.      Just and proper relief and remedy for Defendants permanent destruction, disposal, and spoliation of the helicopter wreckage; and

B.    For such other and further relief as the Court may deem proper.

Dated: January 12, 2024                AVIATION LAW GROUP PS

Attorneys for Plaintiff NAOMI K. TEVES-VALDEZ


By:  /s/Robert F. Hedrick
     ROBERT F. HEDRICK
     HSBA # 10479

ATTORNEYS FOR PLAINTIFF MELE HESIA


BY:  /s/JOHN T. O'CONNELL
        JOHN T. O'CONNELL
        HSBA # 10715


MIYASHITA & OSTEEN, LLLC
Attorneys for Plaintiff TRACY RADER


By:    /s/ Robert Miyashita
        ROBERT MIYASHITA
        HSBA # 9509